UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARGARET E. FAUSTO**,                    Case No. 5:11 CV 1123

              Plaintiff,                    Magistrate Judge James R. Knepp II

     v.                    MEMORANDUM OPINION AND
                             ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

              Defendant.

### INTRODUCTION

Plaintiff Margaret E. Fausto seeks judicial review of Defendant Commissioner of Social Security's decision to deny supplemental security income (SSI) and disability insurance benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). The parties have consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 19). For the reasons given below, the Court affirms the Commissioner's denial of benefits.

### BACKGROUND

Plaintiff filed applications for SSI and DIB in February 2007, alleging a disability onset date of September 1, 2006. (Tr. 132, 139). Her claim was denied initially (Tr. 76, 79) and on reconsideration (Tr. 83, 86). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 91–92). The hearing was held December 3, 2009, about a week before Plaintiff turned 46. (Tr. 31–71, 132). Plaintiff completed high school in special education classes. (Tr. 286). In her brief on the merits, Plaintiff only challenges the ALJ's conclusions on her mental impairments (*see* Doc. 15), and therefore waives any claims regarding the ALJ's determinations regarding physical

impairments. *See, e.g., Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting that failure to raise a claim in merits brief constitutes waiver). Therefore, the Court addresses only pertinent mental health records below.

Plaintiff's Work History

Plaintiff has held a number of jobs over the years, mainly in food service. (*See* Tr. 162). For about eight years, Plaintiff worked at a McDonald's before quitting to find a better-paying job. (Tr. 526). For four years, Plaintiff worked as a salad bar attendant at Shoney's. (Tr. 45, 162, 360). The employer ultimately terminated her for spitting in the food, which Plaintiff denies doing or suggests was done by an alternate personality because she has no memory of the event. (Tr. 45–46, 360). Plaintiff spent a year working in a factory inspecting car parts, but was let go when work declined. (Tr. 48, 360). After working about a month as a cashier at a restaurant, Plaintiff was terminated because she could not do the job quickly enough. (Tr. 162, 360). For the same reason, and because she could not count money accurately enough, Plaintiff was terminated from a position as a cashier at a store. (Tr. 162, 360). Most recently, Plaintiff worked about eight hours per week cleaning houses. (Tr. 33–34, 360).

Medical Records and Counseling History

In July 2005, Plaintiff began treatment at Community Mental Healthcare, Inc. (CMH) (Tr. 414). Her treating psychiatrist Dr. Timothy Conrad has diagnosed Plaintiff with dysthymic disorder, premenstrual dysphoric disorder (PMDD), and schizoaffective disorder. (Tr. 414, 481). Dr. Conrad has prescribed several medications to treat Plaintiff's psychiatric disorders with medications, including Seroquel, Trazodone, and Prozac. (Tr. 415). Plaintiff has also worked with the Bureau of Vocational Rehabilitation (BVR), seeking help finding and retaining employment. (*See, e.g.,* Tr.

2

439–61).

In September 2006, Plaintiff had been laid off from a factory job due to a decline in work, and she sought assistance from BVR. (Tr. 460–61). Within a month, Plaintiff had obtained employment at a Long John Silver's restaurant and hoped BVR could help her keep the job. (Tr. 446). BVR counselor Debra Whinnery reported Plaintiff appeared confused, with scattered thoughts, but was polite and attempted to concentrate. (Tr. 446). Because Plaintiff noted difficulty learning the cash register and menu items, Whinnery recommended a job coach. (Tr. 446).

Creative Rehab coached Plaintiff in her job for 20 hours but could not help her "perform in accordance with the employer's expectations." (Tr. 445). The job coaching report indicated Plaintiff has a very slow work rate, becomes confused easily, and has trouble remembering steps for certain tasks. (Tr. 445). Plaintiff's greatest weakness was the cash register. (Tr. 445). Despite her performance issues, Plaintiff's job coaching report indicated she is highly motivated and tries very hard to succeed. (Tr. 445). She displayed a pleasant personality during her coaching and "was on time every day, present for each shift, and worked the entire shift without any physical problems." (Tr. 445). The job coaching report concluded a fast food setting would not be a good job match for Plaintiff and indicated Plaintiff "may be more successful in a different work setting." (Tr. 445).

A subsequent BVR report indicated Plaintiff has difficulty with short term memory and decision-making skills, suggesting Plaintiff would need help to manage her money and medications. (Tr. 449). The assessment further stated that Plaintiff "is eager to please and works hard" but "does not retain information and cannot multi-task", so she "needs a repetitive job that does not require decision-making, retaining complex information, fast pace or multi-tasking" (Tr. 449). After another attempt at employment – as a cashier at Big Lots – Creative Rehab's job report indicated Plaintiff

3

is able to learn a job after some time, but "[n]eeds to concentrate . . . so she can pick up her speed." (Tr. 300). While Plaintiff once again had difficulty trying to do two things at once, the job coaching report indicated she was trying very hard to multi-task and emphasized the need for Plaintiff to practice job skills to improve. (Tr. 300–01).

At a January 2007 appointment with psychiatrist Timothy Conrad, Dr. Conrad refilled Plaintiff's medications and noted she was stable on them. (Tr. 565). He listed her psychiatric diagnoses as PMDD and dysthymic disorder. (Tr. 565). Several weeks later, Plaintiff attended a session at BVR and exhibited unusual behavior. (Tr. 443). Initially, the BVR session began with a discussion of Plaintiff's inability to use a cash register, with Whinnery and Plaintiff both agreeing any job requiring use of a cash register would not be a good match for Plaintiff. (Tr. 442). Whinnery recommended vocational testing and neuropsychological evaluation, and Metropolitan Housing Authority employee Martin Chumney indicated he and Plaintiff were working on her applications for SSI and DIB. (Tr. 442).

Plaintiff then began to discuss traumatic events she experienced as a child. (Tr. 443). When Plaintiff mentioned the events, Whinnery reports Plaintiff "began to stare off into space and suck her thumb and flap her fingers and rock back and forth in her chair." (Tr. 443). To Whinnery, this looked like a dissociative episode. (Tr. 443). When the episode concluded, Plaintiff reported she had not been aware it happened. (Tr. 443). Plaintiff then described her three alternate personalities: Mike Smithers (a little boy from the 1600s whose father shot and killed him); Kim (a dangerous personality "who throws things and can hurt people"); and an older, toothless black man who encourages Plaintiff not to judge people based on their skin color. (Tr. 443). Plaintiff suggested her dissociative episode had occurred because she was distressed discussing her history of childhood

4

trauma, at which point Whinnery reports another dissociative episode occurring. (Tr. 443).

Plaintiff reportedly discussed the BVR dissociative episode with Licensed Professional Counselor (LPC) Camille Lindon during a session at CMH in early March 2007. (Tr. 564). At her next appointment with her psychiatrist, Dr. Conrad, she mentioned the multiple personality incident and he noted it in his records. (Tr. 564). He stated he planned on ruling out schizoaffective disorder and would review Plaintiff's record, but did not make a new diagnosis or mention dissociative identity disorder. (Tr. 564). Dr. Conrad also indicated recent intelligence testing had shown Plaintiff has a Full Scale IQ of 87, "which puts her in the normal range." (Tr. 564).

Later that month, psychologist Rajendra K. Misra (also affiliated with CMH) assessed a number of tests Plaintiff took and issued a Psychological Assessment Report. (Tr. 523–27). Although Plaintiff discussed her multiple personalities with Dr. Misra, Dr. Misra did not diagnose dissociative identity disorder. (*See* Tr. 524, 526). Assessing Plaintiff's results on the Minnesota Multiphasic Personality Inventory, 2d Ed. (MMPI-2) (a frequently-used personality test), Dr. Misra concluded Plaintiff's MMPI-2 results were invalid. (Tr. 525). Specifically, Dr. Misra found Plaintiff's results "indicate[] she has *over-reported* the nature and extent of her emotional distress in various areas" while simultaneously "trying to *over-report* her mental health, denying even the most common human faults." (Tr. 525) (emphasis in original). Dr. Misra also found Plaintiff falls in the low average range of cognitive skills, with significantly lower verbal skills than other skills. (Tr. 524).

Overall, Dr. Misra concluded Plaintiff's low average range of cognitive skills and excessive emotionality characterize her clinical profile. (Tr. 526). However, Dr. Misra also concluded that in terms of dysfunctional behavior, Plaintiff had been functioning within a relatively normal range. (Tr.

526). Plaintiff worked at a McDonald's for about eight years and quit to find a better paying job; Plaintiff had a current drivers license and no DUIs; and Plaintiff had been living alone in the same apartment since 2000, caring for her cat. (Tr. 524, 526). The next time Plaintiff visited CMH, she discussed job search strategies and stress about her inability to work. (Tr. 562). Eventually Plaintiff and her counselor, Lindon, tracked her personality shifts and spells of lost time with increases in anger, frustration, worry, fear, and confusion. (Tr. 560).

BVR counselor Whinnery reported Plaintiff's general impairments and difficulty learning jobs to neuropsychologist Dr. James Lyall. (Tr. 465). She requested a number of intelligence, memory, personality, and other neuropsychological tests, noting she was "not convinced [Plaintiff] is capable of competitive employment." (Tr. 465). Dr. Lyall reported the findings from his evaluation on April 20, 2007. (Tr. 366–70). On the WAIS-III intelligence test, Plaintiff achieved a Full Scale IQ of 78, placing her in the borderline range.[1] (Tr. 369). During Dr. Lyall's interview with Plaintiff, Plaintiff appeared "mildly confused at times" and discussed her other personalities, mentioning that when they appear she loses periods of time up to half an hour. (Tr. 367). When Plaintiff discussed her childhood trauma with Dr. Lyall, "she became very nonspecific and then appeared to downplay it somewhat later in the conversation." (Tr. 366).

Dr. Lyall diagnosed Plaintiff with dysthymic disorder (moderate to at times severe), dissociative identity disorder (mild to at times moderate), and borderline intellectual functioning. (Tr. 370). He noted Plaintiff's concern about improving her life and her desire to have more successful work and living experiences, and found Plaintiff to be "a psychologically damaged individual who needs a great deal of thoughtful therapy interaction" including "[c]ontinuing

---

1. Plaintiff's Performance IQ (87) was much higher than her Verbal IQ (73). (Tr. 369).

intensive psychotherapy" with a caring and supportive therapist to help her with her significant

emotional difficulties. (Tr. 369–70). Regarding Plaintiff's employment prospects, Dr. Lyall stated:

> She would have difficulty performing jobs that require a quick understanding of
> spoken directions. She would have problems in complex social relationships and
> would tend to feel put down or would become easily upset in any sort of high
> production or tense social environment. *Low-key employment that allows her to work
> in a solitary fashion, away from most people, with a warm and accepting employer
> might be most appropriate*.

(Tr. 369–70) (emphasis added).

Dr. Ryan L. Dunn, the consultative psychologist for Plaintiff's SSI and DIB applications,

reported at the end of May 2007 that Plaintiff "reported a long history of reported personality

changes which she had allegedly hidden from everyone until this reportedly manifested during a

recent BVR interview." (Tr. 362). According to his interview with Plaintiff, at times Plaintiff is

unaware of what goes on when an alternate personality manifests, but at other times she can describe

her behavior during the dissociative episodes. (Tr. 358). Plaintiff reported difficulty taking her

medication consistently, "noting that her mental health symptoms usually emerge when she is taking

medication only sporadically", and she admitted "when she is taking medication consistently her

mood is 'pretty good' and her symptoms are relatively minimal." (Tr. 358). Dr. Dunn described his

impression of Plaintiff's answers to his questions thusly:

> [Her] answers were often nonresponsive or minimally responsive to the questions,
> tending to long and wandering descriptions containing dramatic and vaguely
> described behaviors, often presented as significantly less intense when specific
> follow-up questions were asked. This consistent tendency along with her vagueness
> indicated some likeliness of exaggeration of symptoms and/or minimization of
> functioning.

(Tr. 361). Additionally, Dr. Dunn found Plaintiff "demonstrated sufficient information, judgment,

and the common sense reasoning ability to accomplish such basic life tasks as living independently,

making important decisions concerning the future, and managing finances." (Tr. 361). Despite social anxiety and some conflict with co-workers, Plaintiff "reported being able to function adequately at several of her recent job positions". (Tr. 362).

In his consultation, Dr. Dunn administered and analyzed Plaintiff's results on a number of psychological tests. (Tr. 362). Plaintiff had not slept well the night before the tests because she did not take her sleeping medication, and she had skipped her morning medication as well, fearing its sedative effects on her performance. (Tr. 361–62). Though Plaintiff appeared motivated for testing, she showed significant anxiety and reported fatigue, "suggesting true abilities may lie slightly higher than the scores . . . suggest." (Tr. 362). On the WAIS-III intelligence test, Plaintiff achieved a Verbal IQ of 78, a Performance IQ of 100, and a Full Scale IQ of 87. (Tr. 362). This places her in the low average to average range and indicates she possesses "adequate intellectual functioning for most job settings, particularly those requiring nonverbal intellectual abilities." (Tr. 362). This is consistent with treating psychiatrist Dr. Conrad's notes from March 14, 2007 indicating Plaintiff's Full Scale IQ of 87 places her in the normal range. (Tr. 564).

On the WMS-III test to assess Plaintiff's basic memory abilities, she scored within the average to high average range and Dr. Dunn suggested her true abilities lie at that level or slightly higher, given her fatigue the day of testing. (Tr. 362). According to Dr. Dunn, these results indicate Plaintiff has adequate memory skills for functioning in most job settings. (Tr. 362). Dr. Dunn found Plaintiff has no reported or demonstrated problems in activities of daily living. (Tr. 363). He noted no significant limitations in Plaintiff's ability to understand, remember, and follow instructions or her ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks. (Tr. 363). He noted mild limitations in Plaintiff's ability to withstand stress and pressures

8

associated with day-to-day work (Tr. 363), and moderate limitations in Plaintiff's ability to relate to others, including co-workers (Tr. 363). He also found Plaintiff did not need assistance to manage her money. (Tr. 363). Dr. Dunn concluded Plaintiff's "mental status exam was notable for vague dramatic reports, some nonresponsiveness to questions, and other elements . . . suggesting possible exaggeration of symptoms and minimization of functioning." (Tr. 362).

When Plaintiff failed to show up for a BVR appointment in July 2007, Whinnery noted Plaintiff had recently mentioned her aggressive personality, Kim, coming to the surface lately. (Tr. 441). The next month when Whinnery saw Plaintiff, Plaintiff had shaved her head. (Tr. 440). Plaintiff indicated that around August 1, 2007, Kim manifested and shaved Plaintiff's head, with Plaintiff having no memory of the event. (Tr. 440). Plaintiff felt her dissociative episodes were getting worse – particularly over the prior month – due to stress over lack of money, but stated she had been working cleaning houses. (Tr. 440). Plaintiff also mentioned that her social security application had been denied and she was working on her appeal with Chumney. (Tr. 440). Later in August, Chumney indicated he did not feel Plaintiff was employable. (Tr. 439).

When Plaintiff saw her treating psychiatrist Dr. Conrad in early September 2007, he discovered Plaintiff "had not been on any of her medication for the last two months". (Tr. 550). Dr. Conrad mentioned Plaintiff's shaved hair and reported Plaintiff could not "understand why this [was] going on." (Tr. 550). Dr. Conrad explained to Plaintiff it was because she stopped her medication and needs to be on it. (Tr. 550). This was the worst Dr. Conrad had seen Plaintiff. (Tr. 550). They arranged for Plaintiff to get samples of medication and to fill prescriptions somewhere they would cost less so she could continue treating her psychiatric disorders. (Tr. 550).

The next time Plaintiff saw her counselor, Lindon, her hair was growing out and she did not

9

report any episodes of lost time. (Tr. 554). During fall 2007, Plaintiff continued to report fewer episodes of lost time and verbalized positive feelings about her work cleaning houses. (Tr. 539). Toward the end of 2007, Dr. Conrad reported Plaintiff had been getting her medication and was "much clearer than she has been in the past," but he did note her insight and judgment were "pretty limited." (Tr. 549).

In 2008, Plaintiff saw Dr. Conrad a number of times for follow up appointments and refills on her medications. (Tr. 547–48, 536–37). Although in January 2009, Dr. Conrad noted he sometimes questions whether or not Plaintiff takes her medications (Tr. 534), he reported her medication was working the following month. (Tr. 531). In April 2009, Plaintiff began seeing social worker Lisa R. Dorland for therapy. (Tr. 577). Dorland saw Plaintiff weekly to biweekly for interactive therapy over the course of several months, before evaluating her abilities in a medical source statement. (*See* Tr. 577). In this time, she diagnosed Plaintiff with dysthymic disorder, dissociative identity disorder "with R/O of . . . Factitious Disorder, predominantly psychological and Personality Disorder NOS." (Tr. 577). The most recent medical record from Plaintiff's treating psychiatrist Dr. Conrad, dated May 6, 2009, states: "[Plaintiff's] meds are working and she is doing fine." (Tr. 530).

Medical Source Statements and RFC Assessments

*Treating Psychiatrist Dr. Conrad*

In 2007, Dr. Conrad completed a daily activities questionnaire and medical source statement for Plaintiff's SSI and DIB reconsideration claims. (Tr. 413–16). He reported this information just two months after Plaintiff shaved her hair and stated Plaintiff had limited insight and judgment and at times had confused and tangential thoughts. (Tr. 414). In spite of this, Dr. Conrad stated Plaintiff

10

"[c]an understand and follow basic directions" and is "[a]ble to maintain attention for tasks." (Tr. 415). He described her ability to sustain concentration, persist at tasks, and complete them in a timely fashion as "[a]dequate". (Tr. 415). Dr. Conrad did note that at times Plaintiff experiences limited deficiencies in social interaction due to odd mannerisms and has "rather concrete" difficulty adapting. (Tr. 415). Although he stated Plaintiff has a low stress tolerance, he believed she should be able to complete simple, routine, or repetitive tasks. (Tr. 415). Also at that time, Dr. Conrad believed Plaintiff would be capable of managing any SSI or DIB monetary benefits she might receive. (Tr. 415).

Dr. Conrad's 2007 description of Plaintiff's abilities contrasts sharply with the medical source statement he completed in 2009, which Plaintiff frequently cites in her brief on the merits. (*See generally* Doc. 15). In Dr. Conrad's 2009 assessment, he stated Plaintiff has no useful ability to function in the following areas:

> (1) remember locations and work-like procedures; (2) understand and remember short, simple instructions; (3) carry out short, simple instructions; (4) understand and remember detailed instructions; (5) carry out detailed instructions; (6) maintain attention and concentration for extended periods; (7) work with or near others without being distracted by them; (8) make simple work-related decisions; (9) complete a normal workday or workweek; (10) perform at a consistent pace; (11) interact appropriately with the public; (12) accept instructions and respond appropriately to criticism; (13) get along with co-workers and peers; (14) respond appropriately to changes in the work setting; (15) be aware of normal hazards and take appropriate precautions; (16) travel in unfamiliar places or use public transportation; and (17) set realistic goals or make plans independently of others.

(Tr. 579–80). He based these assessments on her current psychiatric diagnoses of dysthymic disorder and schizoaffective disorder. (Tr. 579–80). Dr. Conrad rated Plaintiff as being able to perform the following activities satisfactorily some of the time: (1) perform activities within a schedule, maintain regular attendance, and be punctual; (2) sustain an ordinary routine without special supervision; (3)

11

ask simple questions or request assistance; and (4) maintain socially appropriate behavior. (Tr. 579–80). In this assessment, the only activity Dr. Conrad opined Plaintiff can perform satisfactorily most of the time was adhering to basic standards of neatness and cleanliness. (Tr. 580).

*Social Worker Dorland*

Dorland, the social worker Plaintiff began seeing for counseling in 2009, also completed a medical source statement. She opined Plaintiff has no useful ability to function in the following areas:

> (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual; (5) sustain an ordinary routine without supervision; (6) work with or near others without being distracted by them; (7) make simple work-related decisions; (8) perform at a consistent pace; (9) respond appropriately to criticism from supervisors; and (10) travel in unfamiliar places or use public transportation.

(Tr. 575–76). She based her opinion on a clinical interview and evaluation of Plaintiff, intellectual and psychological testing, as well as the treatment process. (Tr. 576). Dorland stated Plaintiff can only complete the following activities satisfactorily some of the time:

> (1) remember locations and work-like procedures; (2) understand and remember short, simple instructions; (3) carry out short, simple instructions; (4) complete a normal workday or workweek; (5) interact appropriately with the public; (6) ask simple questions or request assistance; (7) accept instructions; (8) get along with co-workers and peers; (9) maintain socially appropriate behavior; (10) respond appropriately to changes in the work setting; (11) be aware of normal hazards and take appropriate precautions; (12) set realistic goals or make plans independently of others.

(Tr. 575–76). Like Dr. Conrad, the only activity Dorland believed Plaintiff can perform satisfactorily most of the time is adhering to basic standards of neatness and cleanliness. (Tr. 576).

*Consultative Examiner Dr. Dunn*

Consultative psychologist Dr. Dunn also assessed Plaintiff's abilities. (Tr. 363). Dr. Dunn

reported Plaintiff shows no significant limitations in her mental ability to understand, remember, and follow instructions or her mental ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks. He stated Plaintiff shows mild limitations in her mental ability to withstand the stress and pressures associated with day-to-day work activity. (Tr. 363). Dr. Dunn opined Plaintiff has moderate limitations in her mental ability to relate to others, including fellow workers and supervisors, but he also noted she has no reported or demonstrated problems in activities of daily living in the areas of making change, purchasing items, or budgeting for household spending. (Tr. 363). Accordingly, he did not believe Plaintiff needs assistance managing money. (Tr. 363).

*Dr. Edwards – RFC Assessment*

In his RFC assessment, Dr. Edwards found no evidence of limitation in a number of mental abilities. These included Plaintiff's (1) ability to remember locations and work-like procedures; (2) ability to understand and remember very short and simple instructions; (3) ability to carry out very short and simple instructions; (4) ability to maintain attention and concentration for extended periods; (5) ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (6) ability to sustain an ordinary routine without special supervision; and (7) ability to make simple work-related decisions.

He found Plaintiff is not significantly limited in the following areas: (1) ability to understand and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to work in coordination with or proximity to others without being distracted by them; (4) ability to respond appropriately to changes in the work setting; (5) ability to be aware of normal hazards and take appropriate precautions; (6) ability to travel in unfamiliar places or use public transportation; and

(7) ability to set realistic goals or make plans independently of others.

Finally, Dr. Edwards concluded Plaintiff shows moderate limitations in a number of areas, including (1) her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (2) her ability to interact appropriately with the general public; (3) her ability to ask simple questions or request assistance; (4) her ability to accept instructions and respond appropriately to criticism from supervisors; (5) her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (6) her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 372–73). Dr. Edwards found Plaintiff has moderate difficulties maintaining social functioning, but only a mild restriction of activities of daily living and mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 386).

Elaborating, Dr. Edwards noted that although Plaintiff reports a long history of multiple personality disorder, the disorder apparently just recently manifested itself publicly. (Tr. 374). Furthermore, Dr. Edwards stated Plaintiff's reports of her symptoms are inconsistent with the disorder and the evidence. (Tr. 374). After again noting Plaintiff's moderately limited ability to interact with others, Dr. Edwards concluded Plaintiff's mental RFC is "limited to work that is free from frequent contact with others." (Tr. 374). Dr. Orosz later reviewed the medical evidence and affirmed Dr. Edwards's RFC assessment. (Tr. 423).

Administrative Hearing and Decision

A hearing was held on December 3, 2009. (Tr. 31–71). At the hearing, Plaintiff testified about her alternate personalities and indicated in the past, they have manifested at work and caused

14

her employment to be terminated. (Tr. 44–46). When asked how she knew it was Kim and not her main personality who had spit in the food at a restaurant, Plaintiff replied, "[b]ecause Kim is the one personality that would be the type of person that would do it". (Tr. 46).

When asked why Plaintiff had never complained to a doctor about experiencing multiple personalities prior to 2007 after the BVR incident, Plaintiff stated no one else had ever noticed the personalities in the past. (Tr. 58). When asked why she had not mentioned having multiple personalities on her two previous applications for disability, Plaintiff stated she had feared someone would lock her in a mental institution if she reported her personalities. (Tr. 59). She could not state what caused her to lose this fear before her most recent application, but indicated she can no longer control her personalities the way she once could. (Tr. 60–61).

The vocational expert (VE) testified that a person with Plaintiff's physical limitations who has the mental RFC to perform simple unskilled work free from frequent contact with others could perform the job of Housekeeping-Cleaner. (Tr. 64–66). There are 1,000,000 housekeeping jobs nationwide and 30,000 in Ohio. (Tr. 66). In fact, Plaintiff had been working this type of job a minimal number of hours per week in 2007 and 2008. (Tr. 33–34). On cross-examination by Plaintiff's attorney, the VE testified that if Plaintiff's RFC were found to be what Dr. Conrad or her counselor Dorland had assessed in 2009, Plaintiff would not be able to sustain any type of employment. (Tr. 68–69).

The ALJ issued an unfavorable decision on March 23, 2010. (Tr. 12–23). The ALJ found Plaintiff has not engaged in substantial gainful activity since September 1, 2006. (Tr. 14). The ALJ further found Plaintiff has the severe mental impairments of affective disorder and anxiety related disorder. (Tr. 14). However, according to the ALJ's findings, Plaintiff's severe impairment does not

15

meet or medically equal one of the listed impairments because Dr. Dunn's and Dr. Edwards's assessments do not show marked restrictions in at least two of the paragraph B criteria, and because Dr. Edwards's report indicated the paragraph C criteria had not been met either. (Tr. 16–17). Specifically, the ALJ found Plaintiff has only mild restrictions in activities of daily living and with regard to concentration, persistence, or pace. (Tr. 16). He further found Plaintiff has moderate difficulties in social functioning, and no episodes of decompensation. (Tr. 16).

After considering the entire record, the ALJ determined Plaintiff has the RFC to perform light work, except Plaintiff's mental impairments limit her to simple unskilled work that is free from contact with others. (Tr. 17). The ALJ concluded Plaintiff is unable to perform any past relevant work as a cashier or factory labor inspector. (Tr. 22). Because the ALJ found jobs Plaintiff can perform exist in significant numbers in the national economy he found her "not disabled". (Tr. 22–23). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474

16

F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a

preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as

substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc.*

*Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§

423(a)(1)(E), 1382(a)(1). "Disability" is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The

Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920

– to determine if a claimant is disabled:

1.   Was claimant engaged in a substantial gainful activity?

2.   Did claimant have a medically determinable impairment, or a combination
     of impairments, that is "severe," which is defined as one which substantially
     limits an individual's ability to perform basic work activities?

3.   Does the severe impairment meet one of the listed impairments?

4.   What is claimant's residual functional capacity and can claimant perform
     past relevant work?

5.   Can claimant do any other work considering her residual functional capacity,
     age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in the

17

national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f) & 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff asserts two arguments challenging the ALJ's decision:

1. Defendant erred by finding that Plaintiff retains the residual functional capacity to perform simple, unskilled light work that is free from contact with others; and

2. Defendant erred by assigning significant weight to non-examining and consultative physicians, while rejecting the opinions of the Plaintiff's treating psychiatrists, mental health therapists, and vocational rehabilitation counselors who worked directly with Plaintiff for several years.

(Doc. 15, at 1).

Mental RFC Finding

The ALJ found that despite Plaintiff's mental impairments, she remains capable of performing light work that is simple, unskilled, and free from contact with others. (Tr. 17). Plaintiff contends this was error. (Doc. 15, at 1). Because substantial evidence supports the ALJ's conclusion, the Court affirms his RFC finding.

Consultative examiner Dr. Dunn found Plaintiff has no significant limitations in her ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks. (Tr. 363). Dr. Dunn further found Plaintiff has no significant limitation in understanding, remembering, and following instructions, and has only mild limitations in her ability to withstand the stress and

18

pressures associated with day-to-day work activity. (Tr. 363). Additionally, he concluded she had

no reported or demonstrated problems with activities of daily living in the areas of making change,

purchasing items, or budgeting for household spending. (Tr. 363).

      Plaintiff described her daily activities when she filled out her SSI and DIB applications and

during Dr. Misra's psychological assessment. (Tr. 234–36, 523–24). Plaintiff lives alone in an

apartment with her pet cat. (Tr. 233–34, 523). Her reported daily activities are as follows: After

getting up, Plaintiff gets dressed and eats breakfast, plays with her cat, and sometimes watches

movies. (Tr. 234). In 2007 and 2008 when Plaintiff was employed cleaning houses several days a

week, she would leave her home on those days to work for several hours. (Tr. 33–34, 234). After

work, Plaintiff would rest before preparing a simple meal and then watch movies or read a book

before going to bed. (Tr. 234, 361). Plaintiff does take prescription medication to sleep. (Tr. 234).

Plaintiff indicated she cleans her apartment weekly, though she typically cleans only one room at

a time due to reported chronic pain. (Tr. 236, 361). Plaintiff has a valid drivers license and no DUIs.

(Tr. 523). She drives, goes outside daily, and does her own shopping for food, pet supplies, and other

items. (Tr. 236). Plaintiff indicated she goes to counseling and church about twice a month. (Tr.

236–37). Chumney – the Metropolitan Housing Authority employee who worked closely with

Plaintiff – indicated a belief Plaintiff pays her own bills. (Tr. 224).

      Dr. Edwards's RFC assessment also supports the ALJ's mental RFC finding. He found

Plaintiff shows no significant limitation in her ability to understand, remember, and follow

instructions, or in her ability to maintain attention, concentration, persistence, and pace. (Tr. 374).

Dr. Edwards concluded Plaintiff would be limited to work free from frequent contact with others.

(Tr. 374). Additionally, treating psychiatrist Dr. Conrad's 2007 medical source statement supports

the ALJ's RFC finding. In that report, Dr. Conrad stated Plaintiff has an adequate ability to sustain concentration, persist at tasks, and complete them in a timely manner. (Tr. 415). He further stated Plaintiff can understand and follow basic directions and can maintain attention for tasks. (Tr. 415). Even neuropsychologist Dr. Lyall – who evaluated Plaintiff at BVR's request – reported that while Plaintiff would not do well in a high production or tense social environment, "[l]ow key employment that allows her to work in a solitary fashion, away from most people, with a warm and accepting employer might be most appropriate." (Tr. 370). While job coaching reports indicate Plaintiff has difficulty with cash registers and multi-tasking (Tr. 300–01, 442, 445), these reports also indicate Plaintiff always displayed a pleasant personality, was on time and present for each shift, and worked the entire shift without physical problems. (Tr. 445).

Objective intelligence testing shows Plaintiff should have the mental capacity to perform most jobs. Dr. Dunn and Dr. Conrad both reported Plaintiff has a Full Scale IQ of 87. (Tr. 362, 564). According to Dr. Dunn, this means Plaintiff has "adequate intellectual functioning for most job settings", and according to Dr. Conrad, this score places Plaintiff in the normal range. (Tr. 362, 564). Dr. Lyall's assessment indicates a Full Scale IQ in the borderline range, but notes individuals scoring in the borderline range who, like Plaintiff, do well on the Picture Completion subtest, "have a very good ability to pay attention to fine detail and notice detail". (Tr. 368). Additionally, CMH psychologist Dr. Misra's assessment of Plaintiff indicated Plaintiff's MMPI-2 results are invalid because they suggest she completed the test in a random fashion, over-reporting both emotional distress and mental health. (Tr. 525). Dr. Misra also found Plaintiff's behavior to be within a relatively normal range, as Plaintiff had worked at McDonald's for eight years before quitting to find a better paying job, had a current driver's license with no DUIs, and lived alone. (Tr. 526).

20

All this evidence supports the ALJ's conclusion that Plaintiff has the mental RFC to perform light, simple, unskilled work, free from contact with others. (Tr. 17). Further, the job the VE testified Plaintiff could perform with her limitations – Housekeeper-Cleaner – not only exists in significant numbers in the national and local economies, but Plaintiff actually worked in this type of job in 2007 and 2008, when she worked a few hours a week cleaning houses. (Tr. 22–23, 33–34).

Dr. Conrad's 2009 medical source statement and social worker Dorland's medical source statement assess Plaintiff's skills at a much lower level, and the VE testified that a person with such limitations would not be able to sustain employment. (Tr. 68–69, 575–76, 579–80). However, the Court must affirm the ALJ's findings absent a determination the findings are unsupported by substantial evidence in the record. *Walters*, 127 F.3d at 528. Here, substantial evidence supports the ALJ's findings that Plaintiff can perform light, simple, unskilled work free from contact with others. Moreover, for the reasons discussed below, Dr. Conrad and Dorland's assessments indicating a significantly lower level of functioning are inconsistent with substantial evidence in the record and the ALJ properly assigned them little weight.

Treating Physician Rule

Plaintiff argues the ALJ erred by rejecting treating psychiatrist Dr. Conrad's 2009 medical source statement, in which he opined she has no useful ability to function in most areas. (Doc. 15, at 1–2). Plaintiff additionally argues the ALJ should have assigned greater weight to the opinions of her social worker, Dorland, and to the BVR employees' opinions. (Doc. 15, at 1–4). Because these opinions are inconsistent with substantial evidence in the record, and because most of these opinions are not from acceptable medical sources, the Court finds the ALJ properly weighed the opinion evidence and affirms the ALJ's finding that Plaintiff is not disabled.

21

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.927(d). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability; (4) consistency; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Even if the treating physician's opinion is not entitled to "controlling weight," there is nevertheless a rebuttable presumption that it deserves "great deference" from the ALJ. *Id.* Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion. *Id.* Failure to do so requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and

22

who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. The Sixth Circuit has held that an ALJ has discretion to determine the proper weight to accord opinions from "other sources" such as nurse practitioners. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997)).

Plaintiff sought treatment from Community Mental Healthcare beginning in 2005. (Tr. 414). Dr. Conrad was her treating psychiatrist, and the record contains his treatment records from January 2007 through May 2009. (*See, e.g.,* Tr. 530–31, 534, 536–37, 547–50, 564–65). While it is true Dr. Conrad's 2009 Medical Source Statement indicates Plaintiff has no useful ability to function in a multitude of areas, this assessment is inconsistent with his own treatment records, with his own 2007 assessment of Plaintiff's functional abilities, and with other substantial evidence in the record.

In 2007, Dr. Conrad reported Plaintiff "[c]an understand and follow basic directions" and can "maintain attention for tasks." (Tr. 415). He also opined she has adequate ability to sustain concentration, persist at tasks, and complete them in a timely fashion. (Tr. 415). Though he noted Plaintiff's low stress tolerance, he stated she should be able to complete simple, routine, or repetitive tasks. (Tr. 415). Additionally, though he reported Plaintiff has limited insight and judgment and at times has confused and tangential thoughts, Dr. Conrad believed Plaintiff would be able to manage any monetary benefits she might receive. (Tr. 415). Dr. Conrad made these assessments in November 2007 for the reconsideration of Plaintiff's disability claim, just two months after Plaintiff shaved off her hair. (Tr. 413–14, 416).

Although Plaintiff's brief on the merits correctly cites Dr. Conrad's treatment records as stating Plaintiff shaved off her hair and did not understand what was going on, the medical records contain additional details. (Doc. 15, at 2; Tr. 550). For example, Dr. Conrad explained to Plaintiff

23

that the strange things in her life were happening because she had not been on any of her medications for the last two months. (Tr. 550). Plaintiff herself admitted to consultative psychologist Dr. Dunn that "her mental health symptoms usually emerge when she is taking medication only sporadically" and that "when she is taking medication consistently her mood is 'pretty good' and her symptoms are relatively minimal." (Tr. 358). When Plaintiff began taking her medication again, Dr. Conrad's treatment records indicate continual improvement in her symptoms. (*See* Tr. 530–31, 534, 536–37, 547–48). In fact, in May 2009 – just a few months before his 2009 medical source statement indicating Plaintiff's inability to function usefully in most areas – Dr. Conrad stated: "[Plaintiff's] meds are working and she is doing fine." (Tr. 530).

Dr. Conrad's 2009 Medical Source Statement stating Plaintiff has no useful ability to function in most areas simply cannot be read as consistent with his treatment records indicating in 2009, Plaintiff was on her medication and "doing fine." (Tr. 530, 579–80). Moreover, they are inconsistent with his own 2007 assessment. In Dr. Conrad's 2007 assessment – made two months after Plaintiff was off her medications and the worst he had ever seen her – he indicated a much higher level of functioning in most areas. (Tr. 413–16, 550).

The ALJ gave good reasons for discounting Dr. Conrad's 2009 Medical Source Statement: Dr. Conrad's "findings of limitation are . . . inconsistent with the objective evidence." (Tr. 20). Not only are his findings of limitation inconsistent with his own treatment records, but they are also inconsistent with other treatment records from CMH. (Tr. 20). Most notably, psychologist Dr. Misra's findings indicate that Plaintiff functions within a relatively normal range in terms of dysfunctional behaviors. (Tr. 526). Multiple psychologists found Plaintiff had a much higher level of functioning. (*See* Tr. 363 (Dr. Dunn's consultative report); Tr. 372–74, 386 (Dr. Edwards's

24

mental RFC assessment); Tr. 523–26 (Dr. Misra's Psychological Assessment Report); Tr. 415–16 (Dr. Conrad's own 2007 medical source statement)). Thus, the ALJ properly found Dr. Conrad's 2009 medical source statement – which indicated a devastatingly low level of mental functioning precluding Plaintiff from any employment – inconsistent with objective record evidence. (Tr. 20).

For the same reasons as Dr. Conrad's 2009 medical source statement, social worker Dorland's medical source statement is inconsistent with substantial evidence. In addition to being "wholly inconsistent with the record and the objective tests", the ALJ properly determined Dorland is not an acceptable medical source. (Tr. 20). Acceptable medical sources include psychiatrists and psychologists, but the regulations governing evaluation of opinion evidence deem licensed social workers "other sources". *See* 20 C.F.R. §§ 404.1513, 404.1527. Because Dorland is not an acceptable medical source and therefore not a "treating source", the ALJ was not required to give her opinion controlling weight even if it had been consistent with objective evidence. *See* SSR 06-03p, 2006 WL 2329939, at *2. Furthermore, Plaintiff had only been seeing Dorland for counseling for a few months before she completed the medical source statement, and Dorland's records reflect no treatment notes – only a one-page summary indicating her diagnoses and general treatment topics. (Tr. 577). As the ALJ correctly noted during the hearing, the summary tells the Court "next to nothing" about Plaintiff's mental health as assessed by Dorland. (Tr. 39).

Plaintiff also argues the ALJ erred by rejecting BVR counselor Whinnery's and Metropolitan Housing Authority employee Chumney's opinions regarding her limitations. (Doc. 15, at 1, 4, 7). Plaintiff does not succeed with this argument. The ALJ correctly considered that BVR counselors and Housing Authority employees are not acceptable medical sources; thus, the ALJ was not required to give their opinions controlling weight. (Tr. 20–21); *see* 20 C.F.R. §§ 404.1513,

404.1527; SSR 06-03p, 2006 WL 2329939, at *2. Chumney stated he does not feel Plaintiff is employable, and Whinnery stated she is "not convinced [Plaintiff] is capable of competitive employment." (Tr. 439, 465). These opinions regarding Plaintiff's employability are issues reserved to the Commissioner, and opinions on issues reserved to the Commissioner are never entitled to controlling weight. 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-5p, 1996 WL 374183, *2.

Job reports indicate Plaintiff is pleasant, has no problems with job attendance, and is motivated to work hard. (Tr. 300–01, 445). And while Plaintiff and Whinnery agreed any job requiring Plaintiff to use a cash register would not be a good match for her (Tr. 442), the neuropsychological exam BVR asked Dr. Lyall to conduct indicated the type of employment that would be best for Plaintiff: "low-key employment that allows her to work in a solitary fashion, away from most people, with a warm and accepting employer". (Tr. 370). This in no way indicates Plaintiff is incapable of *any* employment. In fact, the ALJ's mental RFC finding that Plaintiff can perform simple, unskilled work free from contact with others seems very consistent with Dr. Lyall's recommendations. (Tr. 17).

Whinnery and Chumney are not acceptable medical sources, gave opinions on issues reserved to the Commissioner, and – like Dr. Conrad's and Dorland's 2009 assessments – their other opinions are inconsistent with substantial record evidence indicating Plaintiff's higher level of functioning. Therefore, the ALJ did not err by assigning their opinions little weight. Because the ALJ did not err in assigning little weight to Dr. Conrad's, Dorlands, Whinnery's, or Chumney's opinions, and because substantial evidence supports the ALJ's conclusions, the Court affirms the ALJ's finding that Plaintiff is "not disabled." (*See* Tr. 23).

**CONCLUSION**

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

s/James R. Knepp, II
United States Magistrate Judge
